**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |
|---|---|
| ALAN H. ASHLEY, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | CASE NO. 3:10cv518-DWD |
| ) | |
| THE PRUDENTIAL INSURANCE ) | |
| COMPANY OF AMERICA, et al., ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

This matter is before the Court by consent of the parties pursuant to 28 U.S.C. §

636(c)(1) on the Defendants' Motion for Summary Judgment (Docket No. 12).  The parties have

thoroughly briefed the matter and it is therefore "ripe" for adjudication.  The Court dispenses

with oral argument because the parties have requested a decision on the briefs and the Court

otherwise concludes that oral argument would not materially aid in the decisional process.  For

the reasons set forth herein, the Defendants' Motion will be GRANTED.

## I. BACKGROUND

The parties have submitted their respective assertions as to what constitutes the

undisputed material facts of the case, and the Court has reviewed not only those respective

position statements, but also all relevant supporting evidence.[1]  As required, the Court resolves

---

[1] Plaintiff previously moved to strike Defendants' Motion for Summary Judgment due to
Defendants' failure to submit a "statement of undisputed facts" in the form of a list, as required
by E.D. Va. Loc. R. 56(B) (Docket No. 16).  This Court summarily denied the motion primarily
because there was no meaningful demonstration of prejudicial impact (Docket No. 17).  Plaintiff
has persisted in his claim that he suffers prejudice from such error, but the Court

all genuine issues of material fact in favor of the non-moving party, and disregards those factual

assertions that are immaterial to resolution of the subject issues.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  Applying the applicable standard, the Court concludes that the

following narrative represents the facts for purposes of resolving the pending motion.

A.      **Ashley's Employment Status**

Alan H. Ashley ("Ashley" or "Plaintiff") was employed as an insurance agent for

Prudential Insurance Company of America ("Prudential" or "Defendant") from February 15,

1971 until some time in 1990.  (Pl.'s Opp'n at 1-2.)  On September 13, 1990, he began to receive

long-term disability benefits, which he continued to receive until he opted to receive pension

benefits from Prudential on December 1, 2003.  (Pl.'s Opp'n at 2; Def.'s Br. at 1.)  Upon first

receiving pension benefits, Ashley learned that Prudential credited him with nineteen (19) years

of service credits pursuant to The 1976 Retirement Plan for United States Employees and Special

Agents (the "1976 Plan"), which was the pension plan in effect at Prudential while Ashley was in

its employ.  (Pl.'s Opp'n at 2, 4.)  However, Ashley asserts that Prudential's determination of

service credits was in error, and that he is, in fact, entitled to thirty-three (33) years of service

credits, based upon his interpretation of the Summary Plan Description ("SPD") of the 1976

Plan.  (Id.)

B.      **Terms of the 1976 Plan**

According to the 1976 Plan, a person is in "Service" whenever, prior to retirement, he is

in either "Credited" service or "Non-Credited" service status, as those terms are defined in §§

---

concludes otherwise, as Plaintiff has been able to adequately set forth his factual contentions.
(Pl.'s Br. Opp'n Mot. Sum. J. ("Pl.'s Opp'n") at 1.)  Accordingly, the Plaintiff has suffered no
meaningful prejudice by any such error on Defendant's part.

403 and 404 of the 1976 Plan document. (Def.'s Br. at Ex. 3 (the "Plan Document") § 402.)[2]

Such a distinction seems simple enough to define, but, unfortunately, the Plan Document inartfully defines "Credited Service" and "Non-Credited Service" by reference to a series of conditions which determines the placement of an employee's service within one category or the other, or in some cases, neither category. (Id.)

**1.) Credited Service According to § 403 of the Plan Document**

As a general rule, "Credited Service" includes an employee's "Active Service," which requires that the employee be both "affiliated with the Company" and "directly or indirectly *paid or entitled to payment for the performance of duties* for the Company or . . . on a paid absence." (Id. § 403.) In turn, a participant's "Pension Formula Amount" is calculated based upon the "completed months of the Participant's Service." (Id. § 802(b).) Ultimately, the amount of such "Service" impacts the "Amount of Normal Pension" as set forth in § 1001. (Id. § 1001(b).)

In addition to the general rule, § 403 defines other circumstances which qualify as "Credited Service." Relevant here, § 403(e) of the Plan Document includes as "Credited Service" those periods during which an employee is paid "short-term disability benefits" under certain specified conditions. However, subsection (e)(2) specifically restricts from "Credited Service" any period that an employee receives disability benefits "after the later of the date of

---

[2] Throughout Prudential's administrative review process, and apparently until the filing of its opposition to the Motion for Summary Judgment, Ashley appears to have based his argument principally on language found in the 2006, as opposed to the 1976, plan document. However, it now appears that Ashley agrees that the 1976 Plan and related SPD govern. (Compare Pl.'s Opp'n at 2-4 with Def.'s Br. Sup. Mot. Sum. J. ("Def.'s Br.") Ex. 6 and Def.'s Br. Ex. 2 at 23.) Accordingly, the Court disregards the parties' arguments concerning the 2006 plan documents, and will hereafter interpret and apply only the 1976 Plan and SPD factors. The Court also notes that the parties occasionally refer to the 1976 Plan as the "1990" Plan -- a reference to the year that Ashley began receiving long-term disability benefits. For clarity, the Court refers to the applicable plan as the 1976 Plan because it is identified as such in Defendant's Exhibit 3.

termination of the person's affiliation with the Company and *the date such disability benefits have been payable for a total of 501 hours.*"  (<u>Id.</u> § 403(e)(2) (emphasis added).)

### 2.)     Non-Credited Service According to § 404 of the Plan Document

In an apparent attempt to add additional clarity to the otherwise cumbersome distinction between "Credited" and "Non-Credited" service, § 404 lists five circumstances which are explicitly defined as "Non-Credited" service.  Relevant to this dispute, § 404(c) includes as "Non-Credited" service "a period of total disability which extends from the date of termination of the person's affiliation with the Company to his reaffiliation, provided such termination results directly from expiration of short-term disability benefits under the Disability Benefits Plan."  (<u>Id.</u> § 404(c).)

### 3.)     Additional Relevant Provisions of the Plan Document

Also relevant to this case, § 504 of the Plan Document confirms that the occurrence of long-term disability will not prevent an employee from later accepting retirement benefits, exactly as did Ashley.  "A former Participant whose Service terminated on account of disability and who is eligible to receive long term disability benefits under the Disability Benefits Plan shall be entitled to a Pension commencing on his Normal Commencement Date in accordance with § 1301"  (Plan Document § 504.)  By its reference to § 1301, which in turn references § 1001, a participant's "Normal Pension" is "the sum of the benefit amounts which have been *credited* to him during his Service," including that portion which derives from the "1976 Benefit Formula" found in § 802.  (<u>Id.</u> §s 504, 802, 1001, 1301 (emphasis added).)  Section 802(b) incorporates a person's tenure with the company as part of the pension formula calculus by

providing an increasing percentage of benefits based upon the number of "completed months of the Participant's *Service*." (Id. § 802(b) (emphasis added).)[3]

In applying such relevant terms of the Plan Document, § 2413 provides that Prudential shall be the "Named Fiduciary" and "Administrator." Accordingly, that section provides that "Prudential shall have the authority to control and manage the operation and administration . . . and shall perform those functions required by the Administrator by the terms hereof and by ERISA."

## C.    1976 Summary Plan Description

The parties agree that the summary plan description at issue (the "1976 SPD" or "SPD") is attached as Exhibit 5 to the Defendant's brief in support of summary judgment.[4] The parties disagree, however, as to whether the document is necessarily consistent with the Plan Document. (Compare Def.'s Br. at 5 with Pl.'s Opp'n at 13.)

The SPD does not explicitly set forth the distinction between "Credited" and "Non-Credited" service that is found in the Plan Document. However, The SPD defines the term "continuous service" as "the years and months you worked for the Company . . . [including]

---

[3] Ashley also posits several arguments concerning provisions that do not influence his accrual of creditable service or, in turn, the value of his pension benefit. For example, he argues that the "Vesting Service" provisions do not explicitly state that an employee's service terminates upon receiving long-term disability benefits. (Pl.'s Br. at 18.) This argument is irrelevant and confuses the issue, as the vesting provisions have no bearing on whether an employee's service is "Credited" or "Non-Credited." In any event, Prudential is correct that the Supreme Court has recognized a distinction between accrual and vesting of benefits. (Def.'s Br. at 8 (quoting Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 749 (2004).) Indeed, the parties agree that Ashley's rights have indeed vested, and disagree only with respect to his accrual of credited service. Accordingly, the Court's analysis will only address the issue of creditable service, not the issue of vesting.

[4] The 1976 SPD submitted for this Court's consideration indicates that it "[d]escribes the current '76 Retirement Plan as it was amended on January 1, 1992." (1976 SPD at 1.) That date was *after* Ashley began to receive long-term disability benefits and, likewise, the reference to that date signifies that the document was not then in effect. Nonetheless, the parties have agreed that the statement constitutes the applicable SPD language, and the Court will accept it as such.

Short-term Disability benefits."  (<u>Id.</u> at 2.)  Continuous service can be lost if a "break in service" occurs, which cannot occur if an employee has earned at least five (5) years of vesting service. (<u>Id.</u> at 10.)  Finally, the SPD states that "[i]f your service *terminates for disability* and you have at least 10 years of continuous service, you may be entitled to Long-term Disability Benefits." (<u>Id.</u> at 11 (emphasis added).)

Among the SPD provisions explaining how a participant's service impacts pension benefits are those provisions concerning "vesting" and, more specifically, "breaks in service," which do not address the subject issue(s) that are pending.  (SPD at 10-11.)  As explained above, *supra* at note 3, vesting is a distinct issue from that of "Credited" versus "Non-Credited" service. Nevertheless, the parties discuss those provisions at length, so the Court has included them here.

According to the SPD, vesting service is determined based on the number of weeks for which a participant employee is paid.  (<u>Id.</u> at 10.)  For each such week, an employee obtains forty-five (45) hours of service.  (<u>Id.</u>)  "*For this purpose*, absences for which [a participant employee] get[s] Company-provided *Short-term Disability* Benefits, military leaves, and up to six months of other types of leaves, are absences which count as service."  (<u>Id.</u> (emphasis added).)  The SPD further explains that "[i]f your service with the Company terminates before retirement -- including *termination for disability* -- and you are vested, the pension you have earned *up to the time you leave* remains vested."  (<u>Id.</u> at 11(emphasis added).)

The SPD also provides some explanation of how the pension plan will be administered. Specifically, it states that "The Prudential administers the Retirement Plan and its administration, interpretation and application of the provisions is binding on all parties."  (<u>Id.</u> at 16.)

**D.     Administrative Review Process**

Ashley challenged Prudential's conclusion that he accrued nineteen (19), as opposed to thirty-three (33) years of credited service, by his pursuit of Prudential's established administrative review process.  In a letter dated June 30, 2009, Ashley initiated his challenge by asserting that the terms of the subject pension plan entitled him to receive pension service credits up to the date of his retirement in 2003.  (Def.'s Br. at Ex. 6.)  Accordingly, he seeks Prudential's re-calculation of his retirement benefits.  In doing so, Ashley cites pages 23 and 62 of the SPD in effect in 2005.  (Compare Def.'s Br. Ex. 6 with Ex. 9.)  Notably, he did not cite either the 1976 Plan Document or 1976 SPD during the administrative review process, though his arguments now rely on the 1976 Plan.[5]

In a letter dated November 27, 2009, Prudential denied Ashley's request.  (Def.'s Br. Ex. 7.)  In doing so, Prudential explained that Ashley's pension benefit is calculated on the basis of the provisions of Article XIII which, according to Prudential's interpretation, is based, in turn, upon the pensioner's years of "Credited Service."  (Id. at 2.)  Specifically invoking § 403(c) of the Plan Document, Prudential concluded that periods of long-term disability count as "Non-Credited Service."  (Id.)  Accordingly, Prudential maintained that its calculation of Ashley's credited service as nineteen (19) years was accurate.

---

[5] As previously explained, *supra* at note 2, Ashley's arguments throughout the administrative review process appear to have erroneously focused on language found in the 2005 Plan Document.  Accordingly, his new arguments, which only now address the language found in the 1976 Plan Document and SPD, were never presented during Prudential's administrative review process.  Such a shift in legal and factual positions implicates Prudential's seventh affirmative defense, that "Plaintiff is limited to the evidence and arguments presented during the administrative process."  (Answer at 4.)  See also Metropolitan Life Ins. Co. v. Price, 501 F.3d 271, 280 (3d Cir. 2007) (exhaustion of administrative remedies in ERISA context is affirmative defense, not jurisdictional).

Ashley appealed the decision, again relying on page 23 of the 2005 Summary Plan Description, without explaining *how* the terms set forth on that page support his argument.[6] The Court nevertheless surmises that he relies on the following text of the referenced page:

> Basic Credits will continue to be added to your *Cash Balance Account* on a monthly basis, based on your Eligible Earnings, up through the earlier of: 1) the date you commence your *Cash Balance Formula benefit*; 2) the first day of the month on or following your 65th birthday; or 3) The date you are no longer eligible to receive long term disability benefits under the Prudential Welfare Benefits Plan.

(Def.'s Br. Ex. 9 (emphasis added).)  The appeal also asserts that the SPD conflicts with the Plan Document because the distinction between "Credited" and "Non-Credited" service does not appear in the SPD, arguing that the SPD terms must prevail as a matter of law.  (Id. (citing Frommert v. Conkright, 233 F.3d 254 (2d Cir. 2006); Wilkins v. Mason Tenders' District Council Pension Fund, 455 F.3d 572 (2d Cir. 2006).)

Prudential's Administrative Appeals Committee (the "Committee") denied Ashley's appeal.  (Def.'s Br. Ex. 10.)  First, the Committee corrected Ashley's incorrect reliance on the 2005 SPD, and redirected him to the applicable 1976 Plan Document and SPD.  (Id. at 2.)  Moreover, the Committee noted that the language cited by Ashley applies only to the "Cash Balance Component," which was added in 2001 -- fifteen years after Ashley terminated his employment with Prudential.  (Id.)  Accordingly, the Committee determined that Ashley's reliance on the provision was misplaced as it had no relevance to his accrued "Credited Service" as determined by the 1976 Plan Document.  (Id.)

_____

[6] Although not entirely clear as to which SPD he refers during his administrative appeal, there is no page 23 of the 1976 SPD, which ends on page 17.  Accordingly, the court considers the reference to be the same reference made in his June 30, 2009 letter when administrative review commenced.

Following the denial of his administrative appeal, Ashley filed this action challenging Prudential's decision pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. To support his position that he is entitled to credited service for thirty three (33) years, Ashley now submits, for the first time, a "Commemoration of Retirement" certificate that Prudential presented him upon his retirement in 2003. (Ashley Aff. at Ex. 1.) However, he had not submitted such evidence during the administrative review process. (Def.'s Reply Br. Sup. Mot. Sum. J. ("Def.'s Reply") at 5 (citing Def.'s Br. at Exs. 6, 8, 9).)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 247-48. Thus, the court must view the record in the light most favorable to the nonmoving party, and must draw all reasonable inferences in its favor. See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002). However, "the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Anderson, 477 U.S. at 252; see also Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson v. Everett, Inc. v. Nat'l Cable Adver., LP, 57 F.3d 1317, 1323 (4th Cir. 1995).

## III. DISCUSSION

Ashley proffers several arguments based on conflicts he perceives between the 1976 Plan Document and the 1976 SPD, as well as his argument that "[f]ederal law requires that an employee receiving disability benefits continue to accrue pension service credits while receiving such benefits." (Pl.'s Opp'n at 9.) Perhaps with the hope that the Court will view his arguments more favorably, he asserts that the Court should review the Plan Administrator's decision based on a *de novo*, rather than the required deferential, arbitrary and capricious, standard of review. In any event, the Court must first address whether Ashley can now raise additional arguments that were not presented during the administrative review process.

## A.      Failure to Exhaust Administrative Remedies

In its Answer, Prudential has asserted that Ashley is limited to the evidence and arguments presented during the administrative process. (Answer at 4.) It has become apparent that in opposing the motion for summary judgment, Ashley has abandoned his previous arguments based on the 2005 Plan Document and SPD, which he relied upon during the administrative process. Instead, he has now adopted new arguments based on the 1976 Plan Document and SPD, and he has now presented new evidence not previously submitted during the administrative review process. (Compare Exs. 6-10 with Pl.'s Opp'n at 13; see also Ashley Aff. at Ex.1.) Accordingly, Prudential seeks to limit the Court's review to only those documents and related arguments presented during the administrative review. (Def.'s Reply at 4-5.)

Ashley's strategy significantly impacts the Court's analysis of what Prudential has filed in its pursuit of dispositive relief. In revising his position only *after* Prudential filed its motion for summary judgment, Ashley has effectively rendered the majority of Prudential's principle arguments moot. For example, one such argument involves the distinction between "cash

balance benefit[s]" and "traditional pension benefit[s]," which is critical to understanding

Ashley's earlier arguments based on the 2005 Plan Document and SPD.  (Def.'s Br. at 9.)

However, no such distinction applies to the 1976 Plan Document and SPD.  Now, Ashley relies

on his new construction of the 1976 Plan Document and SPD to assert that he is entitled to

additional service credits.  (Pl.'s Opp'n at 13 ("[t]he Prudential SPD contained in Exhibit 5 of the

Administrative Record which was in effect at the time of Ashley's service").)

To the extent that Ashley relies on *evidence* not previously submitted during

administrative review, such as Ashley's "Certificate of Appreciation," the Court must disregard

such "new" evidence.  (Ashley Aff. Ex. 1.)  See Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788

(4th Cir. 1995) ("[W]hen a district court reviews a plan administrator's decision under a

deferential standard, the district court is limited to the evidence that was before the plan

administrator at the time of the decision").

There is also authority to suggest that the Fourth Circuit, as the governing appellate

authority, would follow its sister circuits in reversing this Court if it were to consider those

*arguments* that are not already presented in the administrative record.  Voliva v. Seafarers

Pension Plan, 858 F.2d 195, 196 (4th Cir. 1988) (emphasis added) (citing Horn v. Mullins, 650

F.2d 35, 37 (4th Cir. 1981)).  Such a dictate, alone, should prompt this Court to grant the

dispositive relief that Prudential seeks because Ashley's newly crafted arguments were *not*

submitted during administrative review.  However, Voliva's discussion of whether to consider

arguments not previously raised constitutes dicta, separate from the Fourth Circuit's holding in

that case, and this Court is therefore reluctant to establish such a precedent.  Nevertheless, the

Court's analysis of the merits yields the dispositive relief that Prudential seeks.  Accordingly, the

Court will proceed to address the substance of Ashley's arguments, whether they were presented during the administrative process or not.

**B.      Applicable Standards Pursuant to ERISA**

Ashley challenges whether the 1976 SPD contains any language granting discretionary authority to Prudential as plan administrator and fiduciary.  (Pl.'s Opp'n at 6-7.)  In doing so, he has not challenged whether any such language appears in the 1976 Plan Document.  (Id.) Prudential contests this position for two reasons.  First, Prudential argues that both the Plan Document and SPD do, in fact, contain provisions granting discretionary authority.  (Def.'s Reply at 2.)  Second, Prudential argues that, so long as the Plan Document contains the discretionary language, the related SPD need not address the issue.  (Id. at 2-3.)

"When an ERISA plan affords an administrator discretion, a court reviews the administrator's decision to deny benefits for an abuse of that discretion, asking whether the denial of benefits was reasonable."  Stup v. UNUM Life Ins. Co. of Am., 390 F.3d 301, 307 (4th Cir. 2004) (citing Bernstein, 70 F.3d at 787).  Importantly, scrutiny of the administrator's decision must be "based on the facts known to [the administrator] at the time."  Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994).  Consistent with the standard, the administrator's decision must be deemed reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  Stup, 390 F.3d at 307 (citing Bernstein, 70 F.3d at 788).  Eight factors guide the Court's analysis:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

<u>Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan</u>, 201 F.3d 335, 341 (4th Cir. 2000).

### 1.) Discretionary Language in 1976 Plan Documents

As a preliminary matter, the Court must determine whether the 1976 Plan Document invests the Plan Administrator with discretion. The Fourth Circuit has explained that it "does not require specific phrases to trigger a particular standard of review" in ERISA cases. <u>Feder v. Paul Revere Life Ins. Co.</u>, 228 F.3d 518, 522 (4th Cir. 2000) (citation omitted). Where a plan's language expressly creates discretionary authority, a reviewing court need not scrutinize the language further. <u>Id.</u> (citation omitted). However, an explicit grant of discretionary authority is not always required because the plan's terms can create "discretion by implication." <u>Id.</u> at 523. "[I]f the terms of a plan indicate a clear intention to delegate final authority to determine eligibility to the plan administrator, then [the court] will recognize discretionary authority by implication." <u>Id.</u>

Contrary to Ashley's position, both the 1976 Plan Document and SPD contain sufficient language to confer discretion upon Prudential as the Plan Administrator. The relevant language in the Plan Document states that "Prudential shall have the *authority to control and manage* the operation and administration" of the retirement plan. (1976 Plan Document at § 2413 (emphasis added).) Courts have held such language sufficient to signal the drafters' intent to grant an ERISA benefit administrator the "broadest possible discretion." <u>See</u> <u>Lloyd v. Evangeline Health Care, Inc.</u>, 1999 U.S. Dist. LEXIS 6667, at *13 (W.D.N.C. March 31, 1999). Indeed, it is axiomatic that where one is granted "authority to control and manage," such authority necessarily includes the discretion to exercise that authority.

Significantly, the Plan Document also states that "Prudential shall be the 'Named Fiduciary' and 'Administrator.'" (1976 Plan Document at § 2413.) By its very definition in ERISA, a fiduciary is one who "exercises any discretionary authority or discretionary control respecting the management of [a] plan or exercises any *authority or control respecting management or disposition* of its assets." 29 U.S.C. § 1002(21)(A)(i) (emphasis added); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). The subject Plan Document's use of virtually identical language with respect to the Administrator's authority readily confirms the intention to grant discretion to Prudential in that capacity.

Contrary to Ashley's position, the SPD is entirely consistent with the Plan Document on the point. Although the SPD need not contain such language, see Tocker v. Philip Morris Cos., Inc., 470 F.3d 481 (2d Cir. 2006), discretionary authority is embodied in the SPD's statement that ". . . Prudential administers the Retirement Plan and its administration, interpretation and application of the provisions is binding on all the parties." (Def.'s Br. Ex. 5 at 16.) Accordingly, there can be no doubt but that the 1976 Plan confers discretionary authority on the Plan Administrator -- Prudential -- requiring this Court to review its decision pursuant to the "arbitrary and capricious" standard.

**2.)    Relevant Factors for Consideration**

Booth sets forth eight nonexclusive factors for the Court to apply in reviewing the Administrator's decision, several of which are inapplicable to the arguments presented here. 201 F.3d at 341. For example, Ashley has not argued that the Administrator failed to consider the purpose and goals of the Plan; that it failed to adequately consider the materials presented during the administrative review process; that the decision-making process or procedure contained any procedural defects; or that any external standards govern the Administrator's exercise of

discretion.  Accordingly, the resolution of the case centers on the Administrator's interpretation

of the Plan language in conjunction with the purposes and goals of the Plan, as well as other

provisions in the Plan (essentially, factors one, two, and four).

        **3.)    Conflict of Interest Factor**

Citing <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, Ashley argues that if the "abuse of

discretion" standard applies, the Court must also consider the inherent conflict of interest present

when a plan administrator acts as both decision-maker and benefits-payor.  (Pl.'s Opp'n at 7.)

Indeed, <u>Glenn</u> instructs a court to "take account of the conflict when determining whether the

trustee, *substantively or procedurally*, has abused his discretion," while otherwise

acknowledging the deferential standard of review that applies.  <u>Id.</u> at 115 (emphasis added)

(citations omitted).

In accounting for the factor, the Court first notes that Ashley has failed to explain how

such a conflict either "substantively or procedurally" impacted the Administrator's

determination.  As the Supreme Court explained in <u>Glenn</u>, the "conflict of interest" factor

"should prove *more important* (perhaps of great importance) where circumstances suggest a

higher likelihood that it affected the benefits decision."  <u>Id.</u> at 117 (emphasis added).  Justice

Roberts, concurring in part, wrote separately to explain that he "would instead consider the

conflict of interest on review *only* where there is evidence that the benefits denial was motivated

or affected by the administrator's conduct."  <u>Id.</u> at 120 (Roberts, C.J., concurring) (emphasis

added).  The majority in <u>Glenn</u> appears to accord little weight to the conflict of interest factor in

cases in which no impact is readily apparent -- and Justice Roberts would accord it no weight at

all.  Either way, the impact of a conflict on an administrator's unfavorable decision is relevant to

the analysis, but Ashley fails to explain how a conflict of interest, if any, affected Prudential's ultimate decision.

Moreover, any conflict of interest that may have been involved was minimal at best. The conflict of interest factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias." Id. at 117. To that end, it is noteworthy that Prudential does not pay benefits directly out of its general coffers, but funds those payments out of a non-reversionary pension trust and a group annuity contract. (Def.'s Reply at 3.) So if Prudential denies a beneficiary's claim, it still would not acquire any fiscal benefit from that denial, so how could any structural conflict of interest exist? See Guthrie v. Nat'l Rural Elec. Coop. Ass'n Long-Term Disability Plan, 509 F.3d 644, 650 (4th Cir. 2007) (citing Bedrick v. Travelers Ins. Co., 93 F.3d 149, 151 (4th Cir. 1996)); see also Lance v. Ret. Plan of Int'l Paper Co., 331 F. App'x 251, 255 (4th Cir. 2009). Accordingly, Prudential's conflict of interest, if any, approaches the "vanishing point" that the Supreme Court discussed in Glenn such that the factor is accorded no meaningful weight compared to the other factors. 554 U.S. at 117.

Thus, the Court addresses the more salient factors, such as the Plan language, and it will revisit the "conflict of interest" factor only if consideration of the other factors fails to yield a clear resolution.

**C.      Prudential's Determination of Creditable Service**

In order to assess whether Prudential exercised sound discretion in its calculation of Ashley's retirement benefit, the central issue is whether Prudential's construction of the 1976 Plan Document is reasonable, particularly in conjunction with the 1976 SPD and applicable provisions of ERISA.

### 1.) Regulatory Authorities – Applicability of 29 C.F.R. § 2520.200b-2

Initially, Ashley contends that the U.S. Department of Labor regulations promulgated pursuant to ERISA explicitly mandate continued accrual of pension service credits throughout a period of long-term disability, regardless of duration.  (Pl.'s Opp'n at 9 (citing 29 C.F.R. § 2530.200b-2).)[7]  In support of his position, Ashley notes that the regulation makes no distinction between long-term and short-term disability benefits.  He is correct in that those particular words never appear in that section.  His conclusion is misplaced, however, when considered in conjunction with that portion of the regulation which he has omitted.  (Compare Pl.'s Opp'n at 9 with Def.'s Br. at 10.)  The entire section states:

> (a)(2) An hour of service is each hour for which an employee is paid, or entitled to payment, by the employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence.   Notwithstanding the preceding sentence, (i) *[n]o more than 501 hours of service are required to be credited under this paragraph (a)(2) to an employee on account of any single continuous period during which the employee performs no duties* (whether or not such period occurs in a single computation period).

29 C.F.R. § 2530.200b-2 (2011) (emphasis added).  By omitting subsection (a)(2)(i), Ashley has neglected the exception which applies to his situation.

Ashley's period of long-term disability from 1990 through his retirement was a single continuous period during which he performed no duties.  Thus, the regulation mandated only that Prudential credit him for the first 501 hours of service during which he was disabled.  Contrary to Ashley's position, there is simply no language in the regulation to suggest that 501 hours must be credited for each year of his disability.  Rather, the plain language of the regulation

---

[7] Although Ashley's brief in opposition actually cites 29 C.F.R. § 2520.200b-2, the reference appears to be in error, as the language he has set forth is actually found at 29 C.F.R. § 2530.200b-2.  Indeed, Part 2520 of those regulations, which Ashley cites, relate to reporting and disclosure requirements – not minimum standards, which are instead found at Part 2530.

specifically notes that 501 hours is the total limit, "whether or not such period occurs in a single computation period" -- presumably the "years" to which Ashley refers. (Id.)

In reality, Prudential's calculation of service credits accounted for the 501 hour mandate set forth in the regulation by complying with § 403(e)(2) of the Plan Document, which provides that a plan participant accrues credited service during a period of short-term disability, except that:

> Any benefit payable under the Disability Benefits Plan shall not be considered a disability benefit for the purpose of this subsection (e) if it is paid after the later of the date of termination of the person's affiliation with the company and *the date such disability benefits have been payable for a total of 501 hours*.

(Def.'s Br. Ex. 3 at 11 (emphasis added).) Whether categorized as short-term or long-term disability, Prudential's only obligation, according to the regulations and the 1976 Plan Document, was to credit the first 501 service hours during which Ashley was not working due to his disability.

Ashley has submitted no claim that Prudential failed to provide what amounts to approximately one-half year of service credits for that initial period of disability, and neither party has submitted evidence explaining whether that portion was credited in Prudential's calculation. In any event, Ashley's reliance on the regulation fails to establish that he is entitled to service credits for the entirety of the period between 1990 and 2003, or for that matter, 501 service hours each and every year of that period. Accordingly, the regulation has no relevance to the Administrator's decision.

### 2.) Calculation of Creditable Service According to the Plan's Language

Ashley's central argument asserts that his "affiliation" with Prudential continued throughout the period during which he received long-term disability benefits, and that such affiliation is sufficient to entitle him to service credits pursuant to the 1976 Plan Document and

SPD. "Affiliation" is an undefined, nebulous, broad-reaching term that might arguably encompass his period of total disability. Nevertheless, nowhere in the Plan Document does it provide that "affiliation," alone, gives rise to constituting "Credited" service.

The general rule pursuant to the terms of the 1976 Plan Document is that: "[a] person's Credited Service includes . . . any period of Active Service, which is a period while he is affiliated with the Company . . . and is directly or indirectly paid or entitled to payment *for the performance of duties for the Company*." (1976 Plan Document at § 403(a) (emphasis added).) Ashley was not performing duties for Prudential between 1990 and 2003 when he was not working due to his disability. Thus, only if Ashley satisfied one of the exceptions to the general rule could he obtain "Credited Service" pursuant to § 403 of the Plan Document. The only applicable exception that may apply is that contained in subsection (e) which, as explained *supra* at § III(C)(1), provides for no more than 501 hours of additional credit (i.e. about half a year).[8]

The Plan Document is not without its deficiencies. One such flaw in its terms can be found at § 402(a), which broadly defines "Service" to include "a period of Credited *or Non-Credited* Service determined in accordance with § 403 and 404." (1976 Plan Document at § 402(a) (emphasis added).) Assuming, *arguendo*, that Ashley was accruing "Non-Credited Service" with Prudential between 1990 and 2003, he would be in "Service" according to § 402(a). And because § 802(b) calculates a participant's "Pension Formula Amount" based on the "completed months of the Participant's *Service*," with no mention of the distinction between

---

[8] The characterization of 501 hours as equating to about one-half of a year is based upon § 407 the Plan Document which, for vesting purposes only, defines a year of credited service as total hours divided by 1,000 hours, and § 406, which defines a break year as any year in which a participant accumulates five-hundred or fewer hours as a break year. The implication is that 1,000 hours equals one full vesting year, and that accumulation of 501 hours in a single year prevents the occurrence of a break year.

"Credited" and "Non-Credited" service, it is understandable that Ashley would misperceive his "Non-Credited" service as a variable in the calculation of his accrued benefits. (emphasis added).

However, there are several problems with such a construction.  It is not altogether certain that Ashley's period of total disability qualifies him for "Non-Credited" service as that term is defined at § 404(c) of the Plan Document.  According to that subsection, "Non-Credited" service would include the disability period "from the date of termination of the person's affiliation with the Company to his reaffiliation."  Ashley asserts, however, that his "affiliation" never terminated, despite his receipt of long-term disability benefits.  (See Pl.'s Opp'n at 2-4.) Consistent with such a position, he does not contend that he ever "reaffiliated" with Prudential.  Thus, the definition at § 404(c) would not appear to encompass Ashley's circumstances.

Even so, a period of "Non-Credited" service could not logically equate to "Credited" service for purposes of the pension benefit formula.  Such a construction would be patently unreasonable because it altogether eliminates an axiomatic, as well as explicit, distinction between "Credited" and "Non-Credited" service.  As a plan administrator and fiduciary operating with discretionary authority, Prudential was obligated to interpret the Plan according to a "deliberate, principled reasoning process."  Stup, 390 F.3d at 307 (citing Bernstein, 70 F.3d at 788).  Such a process must account for the Plan language at issue, accounting for the purposes of the Plan and all provisions, read together as a whole.  See Booth, 201 F.3d at 341.  By rejecting an interpretation that would effectively render the "Non-Credited Service" provisions a nullity, Prudential satisfied its burden to undergo a "deliberate, principled reasoning process" in reaching its conclusion.  See Stup, 390 F.3d at 307 (citation omitted).

Within its sound discretion as plan administrator, Prudential was charged with the unenviable task of interpreting cumbersome plan language.  It cannot, and did not, rewrite the

Plan.  Instead, it chose an interpretation that gives effect to the distinction between "Credited" and "Non-Credited" service provisions of the Plan Document.  And even if Prudential's interpretation was not the only reasonable one, it is well within the bounds of permissible interpretations entitled to deference by this Court.  See Stup, 390 F.3d at 307 (citation omitted).

### 3.) Comparing the Plan Document to the SPD

Ashley further challenges Prudential's calculation of benefits due to perceived inconsistencies between the Plan Document and its companion SPD.  According to Ashley, the "break in service" and "vesting" provisions in the SPD conflict with the "credited service" provisions of the Plan Document.  (Pl.'s Opp'n at 13.)  However, as previously explained, *supra* at note 3, the vesting provisions are relevant only to determine *whether* Ashley is entitled to benefits, not the *extent* of the benefits to which he is entitled.  See Cent. Laborers' Pension Fund, 541 U.S. at 749 (emphasis added).  Accordingly, those provisions are irrelevant where Prudential does not dispute that Ashley is vested.

Moreover, those provisions of the SPD concerning "vesting" and "break in service" are indeed consistent with the corresponding "vesting" and "break in service" provisions of the Plan Document.  To the extent that such provisions appear inconsistent with "credited service" and "non-credited" service provisions, such is only because the latter are related solely to the calculation of benefits -- not vesting.  Ashley's argument fails because the two concepts are necessarily distinct and, therefore, one cannot necessarily expect them to be necessarily consistent.  See Id.[9]  As such, Ashley is essentially comparing "apples to oranges."

---

[9] Because Prudential's interpretation is reasonable, the Court need not apply the doctrine of *contra proferentem* as suggested by Ashley.  (Pl.'s Opp'n at 15.)  The Fourth Circuit has instructed that the doctrine is disfavored as a means of constraining a plan administrator's discretion.  See Carden v. Aetna Life Ins. Co., 559 F.3d 256, 260 (4th Cir. 2009) (citing Glenn, 554 U.S. at 119); see, e.g., Vaughan v. Celanese Ams. Corp., 339 F. App'x 320, 328 (4th Cir.

Factually and logically, Ashley's more persuasive argument concerns the omissions from the 1976 SPD. He is factually correct that "[t]he Prudential SPD and plan language do not specifically state that a claimant shall not continue to accrue pension service credits while receiving long-term disability benefits." (Pl.'s Opp'n at 16.) Logically, such an omission would support a finding in Ashley's favor if there is support in the law. However, there is no such authority.

Although it is true that the SPD does not provide as much detail on how disability will affect a participant's retirement benefit, it does provide that "Continuous Service" includes "any absences for which you receive Company-provided Short-term Disability benefits." (1976 SPD at 2.) In tandem, the inclusion of "Short-term Disability benefits," together with the omission of the term "Long-term Disability benefits," signals to the reader that only during periods of short-term disability does an employee earn credit for those purposes. Consistent with the definition of "Credited Service" in the 1976 Plan Document, the definition of "Continuous Service" in the SPD permits up to approximately one-half year of credit while on disability.[10]

Finally, the mere fact that the SPD is "silent" on a particular aspect of the 1976 Plan Document does not create a conflict between the two documents. Where "the Plan gives more detail than the SPD but does not contradict its terms, there is no conflict between the Plan and the SPD." Martin v. Blue Cross & Blue Shield of Va., Inc., 115 F.3d 1201, 1205 (4th Cir. 1997); see also Grant v. Sprint Nextel Corp., 720 F. Supp. 2d 732, 737 n.3 (W.D. Va. 2010) (citing

2009) ("Generally, this Court limits the application of the doctrine of *contra proferentem* in ERISA cases to the interpretation of complicated insurance contracts, particularly health insurance contracts") (citations omitted).

[10] Although the term "Credited Service" is left undefined in the 1976 SPD, the Court agrees with Prudential that there is no substantive difference between that term and the SPD's definition of "Continuous Service." (Def.'s Reply at 11.) Accordingly, any semantic distinction is irrelevant to the Court's analysis.

Martin, 115 F.3d at 1204-1205).  In Grant, 720 F. Supp. 2d, the beneficiary prevailed due to an omission in the SPD only because "the SPD omitted information that it was required by law to contain."  Id. at 737 n.3.  Such content requirements are set forth at 29 C.F.R. § 2520.102-3, none of which require the information omitted here -- namely, how a period of total benefits disability impacts the calculation of benefits.  In any event, Ashley offers no argument that any disclosures mandated by this regulation were omitted from the SPD.

Summary judgment is therefore appropriate because the terms of the Plan Document and SPD are, indeed, consistent and the omission of certain specific information in the SPD is insufficient to create an ambiguity.

**D.      Breach of Fiduciary Duty**

As an apparent alternative theory of his case, Ashley argues that the Trustees of the Prudential retirement plan "breached their duty to act in the best interests of the [P]lan participants by failing to provide accurate and complete information in the Plan SPD."  (Pl.'s Opp'n at 20.)  But as the Court has already explained, the SPD was consistent in all essential respects with the Plan Document, both of which indicate that a beneficiary would receive approximately six (6) months of credited service for a period of *short-term* disability.  (1976 Plan Document § 403(e)(2); 1976 SPD at 2 (emphasis added).)  In assessing whether Prudential breached its fiduciary duty, the Court "must ask whether the fiduciary engaged in a reasoned decision-making process."  Difelice v. U.S. Airways, Inc., 497 F.3d 410, 420 (4th Cir. 2007). Here, the Court has determined that Prudential employed a reasoned decision-making process in its interpretation of the applicable provisions of the 1976 Plan Document.  Accordingly, it fulfilled its duty to the Plan beneficiaries, and Prudential's motion for summary judgment can be granted on that additional basis as well.

**E.      Trustees as Defendants**

Although summary judgment is granted for the reasons already set forth, one final issue remains.  In addition to Prudential, Ashley identified as defendants the unnamed "Trustees of the Prudential Merged Retirement Plan."  Prudential argues that although there is a split among the circuits as to whether the proper defendant is the plan administrator or the plan itself, the Fourth Circuit has held that the trustees are not proper defendants.  (Def.'s Br. at 11-12.)  In <u>Gluth v. Wal-Mart Stores, Inc.</u>, Case No. 96-1307, 1997 U.S. App. LEXIS 16451, at *18 (4th Cir. July 3, 1997) (citation omitted), the Fourth Circuit indicated that it was reversible error for the court to permit pensioner's claim to proceed against the plan trustees.  Ashley has cited no authority to the contrary, and submitted no evidence that the subject Trustees breached their duty with regard to the Pension assets.  Accordingly, the Court would also grant Prudential's motion for summary judgment on that issue, were it necessary to do so in its disposition of the case.

## IV. CONCLUSION

For the reasons discussed herein, the Defendants' motion for summary judgment (Docket No. 12) is GRANTED.

An appropriate Order shall issue.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

Richmond, Virginia
Dated: April 18, 2011